IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA**

    v.                                       Case No. 3:18-cr-00319-MO-06

**CHAD LEROY ERICKSON,**                       OPINION & ORDER

             Defendant.

**MOSMAN, J.,**

      In August 2021, the government moved to exclude testimony from mental health experts in the trial of Defendant Chad Erickson. Mot. in Lim. [ECF 619]. Erickson sought to admit the expert testimony to show that his brain injury and mental illness diminished his capacity to form the intent necessary to commit the crimes with which he had been charged. I granted the government's motion, excluding this line of testimony. Mins. of Proceeding [ECF 699]. This opinion more fully explains the rationale for my decision.

## BACKGROUND

### I.    The Counts

      The government indicted Chad Erickson—along with five other co-defendants—in November 2018. Superseding Indictment [ECF 81]. The superseding indictment charged Erickson on five counts: (1) racketeering conspiracy; (2) murder in aid of racketeering; (3)

kidnapping in aid of racketeering, resulting in death; (4) kidnapping resulting in death; and (5) conspiracy to commit kidnapping, resulting in death. *Id.*

The racketeering conspiracy count, brought under 18 U.S.C. § 1962(d), alleged criminal involvement with the Gypsy Joker Motorcycle Club. The jury ultimately found Erickson not guilty of racketeering conspiracy. Verdict Forms [ECF 795].

The other four counts alleged Erickson participated in the abduction, torture, and murder of Robert Huggins. On June 30, 2015, Huggins, a former member of the Gypsy Jokers, was transported from Portland, Oregon, to a shack in Woodland, Washington. There, Huggins was brutally beaten, tortured, and ultimately killed. Erickson and his co-defendants ostensibly targeted Huggins as retribution for his robbery of the residence of Mark Dencklau, the president of the Portland chapter of the Gypsy Jokers. The jury found Erickson guilty on all the murder and kidnapping counts with which he was charged. *Id.*

## II.    Erickson's Mental Capacity Defense

As his defense to the murder and kidnapping charges, Erickson conceded that he was present at the Woodland shack when Huggins was killed but argued that he was not a participant in the crime. To bolster this defense, Erickson sought to introduce testimony from three expert witnesses: Dr. David Siker, Dr. Erin Bigler, and Dr. Dale Watson. As deduced from expert reports, the parties' briefing, and *Daubert* hearings, these expert witnesses were to testify as follows.

### A.  Dr. David Siker

Dr. Siker is a radiologist who performed a Magnetic Resonance Imaging (MRI) scan on Erickson's brain in 2021. Erickson described Dr. Siker as a "foundational witness," meant only to authenticate the brain scans Erickson hoped to introduce. Resp. to Mot. in Lim. [ECF 640] at

6; *see also* Tr. of Pretrial Conf. (Afternoon Session) [ECF 709] at 111:25 (describing Siker as "essentially the photographer").

### B. Dr. Erin Bigler

Dr. Bigler is a neuropsychologist who analyzed the scans conducted by Dr. Siker. This analysis showed that Erickson has experienced significant brain damage throughout his life, including traumatic brain injury (TBI). Dr. Bigler opined that TBI, when combined with Erickson's other ailments, like post-traumatic stress disorder, diabetes, and hypertension, would explain significant white matter abnormalities in Erickson's brain. Tr. of Pretrial Conf. (Morning Session) [ECF 708] at 32:11–23. These abnormalities can be associated with deterioration of memory, processing, attention, impulse control, and overall executive functioning, including complex reasoning and decision-making. *Id.* at 36:19–23, 56:25–57:3. Dr. Bigler also suggested that individuals with brain injuries like Erickson's are more susceptible to being talked into doing something they might not otherwise do. *Id.* at 57:10–18.

### C. Dr. Dale Watson

Dr. Watson is a neuropsychologist who conducted a psychological evaluation of Erickson. As a result of his tests, Dr. Watson concluded that, while Erickson "had the capacity to inform [sic] intent in a lot of different areas," his ability to think diminishes "as circumstances become more complex" and "emotionally laden." *Id.* at 64:2–6. Other mental defects that Dr. Watson identified are poor impulse control, poor focus, poor understanding of others' intentions, poor memory, and a reduced ability to "track ongoing events." *Id.* at 64:12–17, 65:14–66:3. Moreover, Dr. Watson opined that his testing corresponded with the areas of damage identified in the MRI scans of Erickson's brain. *Id.* at 62:20–24.

## DISCUSSION

### I.    Overview of Diminished Capacity Defense

Generally, evidence of a defendant's mental defect is offered for one of two purposes: to support a defense of insanity or to support a defense of diminished capacity. *United States v. Twine*, 853 F.2d 676, 678 (9th Cir. 1988).[1] Whereas an insanity defense seeks to "completely excuse" a defendant's guilt, diminished capacity "is directly concerned with whether the defendant possessed the ability to attain the culpable state of mind which defines the crime." *Id.*

In 1984, Congress passed the Insanity Defense Reform Act (IDRA), which significantly restricted the use of mental defect evidence in criminal trials. 18 U.S.C. § 17 (stating that, outside of an affirmative insanity defense, "mental disease or defect does not otherwise constitute a defense"). Nevertheless, the Ninth Circuit has determined that IDRA leaves room for a diminished capacity defense. *Twine*, 853 F.2d at 679 (citing *United States v. Frisbee*, 623 F. Supp. 1217 (N.D. Cal. 1985); *United States v. Gold*, 661 F. Supp. 1127 (D.D.C. 1987); *United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987)). Specifically, IDRA allows the introduction of expert testimony to negate specific intent. *Frisbee*, 623 F. Supp. at 1222.

However, district courts have been warned to be cautious in analyzing the admissibility of diminished capacity evidence. *Pohlot*, 827 F.2d at 905. Though IDRA does not specifically prohibit a diminished capacity defense, IDRA limits it to the extent it coincides with the overarching concerns that IDRA sought to address. In *United States v. Cameron*, 907 F.2d 1051, 1061–62 (11th Cir. 1990), the Eleventh Circuit identified three core concerns that gave rise to

---

[1] In *United States v. Pohlot*, 827 F.2d 889, 903 (3d Cir. 1987), the Third Circuit observed that the term "diminished capacity" has been given a variety of different meanings by the courts. Here, I use the term to refer to "the evidentiary doctrine" that "is not a defense at all but merely a rule of evidence; specifically, the admission of evidence of mental abnormality to negate mens rea." *Id.* Though the Third Circuit would dub such use of the term to be "inappropriate[]," the Ninth Circuit appears to use this definition, *see Twine*, 853 F.2d at 678, so I will use it here.

IDRA that district courts should keep in mind when determining whether to admit evidence of a mental defect.

First, Congress intended "to eliminate any form of legal excuse based upon one's lack of volitional control," including "a diminished ability…to reflect adequately upon the consequences or nature of one's actions." *Id.* at 1061. Second, Congress "'intended to insure that the insanity defense is not improperly resurrected'" as "'some similarly asserted state of mind which would serve to excuse the offense.'" *Id.* at 1061–62 (quoting S. Rep. No. 98-25, 98th Cong., 2d Sess. 229 (1984)). And third, Congress was concerned that expert psychiatric testimony could be "misused at trial to mislead or confuse the jury." *Id.* at 1062.

Circuit courts have also indicated that the kind of diminished capacity that could act to negate mens rea is exceedingly rare. As the Third Circuit recognized, "only in the most extraordinary circumstances could a defendant actually lack the capacity to form mens rea" because "[e]ven the most psychiatrically ill have the capacity to form intentions." *Pohlot*, 827 F.2d at 903. As such, most offerings of diminished capacity merely speak "of an incapacity to reflect or control the behaviors that produced the criminal conduct." *Cameron*, 907 F.2d at 1066. Such evidence does not negate specific intent, but rather acts as an improper resurrection of the pre-IDRA insanity defense, allowing a defendant to circumvent culpability by establishing a general state of mind. *Id.*

Thus, the dividing line between admissible and inadmissible diminished capacity evidence is whether the offered evidence tends to negate the mens rea required for the crime charged.[2] *United Pohlot*, 827 F.2d at 905–06. A diminished capacity defense cannot be a general,

---

[2] In *United States v. Westcott*, 83 F.3d 1354, 1358 (11th Cir. 1996), the Eleventh Circuit identified the dividing line as whether "the evidence focuses on the defendant's specific state of mind at the time the offense was committed." Specifically, the *Westcott* court distinguished "[e]vidence that a defendant lacks the capacity to form mens rea" from "evidence that the defendant actually lacked mens rea." *Id.* Yet this reasoning does not line up with Fed. R. Evid.

all-purpose excuse that a defendant is incapable of forming intent. Instead, it must show that the defendant "was incapable of forming the specific intent required by the charged offense." *United States v. Christian*, 749 F.3d 806, 809 (9th Cir. 2014), *overruled on separate grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020).

## II.    Application to Erickson

The expert evidence offered by Erickson would have shown that he had the following mental deficits: (1) poor memory; (2) poor concentration; (3) difficulty thinking in stressful situations; (4) impulsivity; (5) reduced executive functioning; (6) greater susceptibility to manipulation; and (7) low awareness of his surroundings. The government objected to these deficits as inadmissible under Fed. R. Evid. 401, or, in the alternative, under Fed. R. Evid. 403. I agree with the government.

### A. Fed. R. Evid. 401

I find that none of these mental defects would be relevant under Fed. R. Evid. 401 in determining the mens rea required for Erickson to have participated in the murder and kidnapping of Huggins.[3] Some of the mental deficits have little to do with the formation of intent. For example, Erickson's poor memory could in no way preclude him from forming the intent to murder or kidnap someone. Other mental deficits, like impulsivity and reduced executive functioning are of the kind that IDRA unambiguously sought to eliminate as defenses.

---

704(b), which precludes an expert witness from opining about whether a defendant had the mens rea that constitutes an element of the crime charged. In support of this characterization, the *Westcott* court cites to *Pohlot*, 827 F.2d at 905. But a close reading of *Pohlot* does not support such a distinction—instead, it appears the *Westcott* court is referring to *Pohlot*'s description of the development of California law. *See Pohlot*, 827 F.2d at 905 (describing a California law as "abolish[ing] the use of evidence to show that a defendant lacks the capacity to form mens rea," while still permitting "the use of evidence of mental disease to show that a defendant actually lacked mens rea"). Therefore, I disagree with *Westcott* inasmuch as it could be read to require psychiatric experts to opine on a defendant's intent at the time the charged crime was committed.

[3] Erickson also offered the expert evidence to negate the mens rea required for racketeering conspiracy. I found that the evidence was inadmissible for largely the same reasons it was inadmissible for the other charges. However, because Erickson was acquitted of the racketeering conspiracy charge, I do not discuss it in this opinion.

*Cameron*, 907 F.2d at 1061 ("[I]t is clear that Congress meant to eliminate any form of legal excuse based upon one's lack of volitional control.").

Some deficits, though tangentially related to intent formation, do not preclude a defendant from forming criminal intent. *See United States v. Aleykina*, 827 F. App'x 708, 710 (9th Cir. 2020) (upholding the exclusion of testimony about the defendant's erratic behavior when that behavior was "not incompatible with the ability to form the requisite mens rea or criminal intent" for the crimes with which she was charged); *see also Larsen v. Paramo*, No. 13-cv-04884-JST, 2015 WL 831000, at *22 (N.D. Cal. Feb. 23, 2015) (excluding evidence on defendant's Asperger's Syndrome and accompanying susceptibility to manipulation because neither precluded him from forming intent). That is, given the low bar necessary to prove a defendant acted intentionally, the presence of such mental deficits would be of no help to a jury in determining whether Erickson acted with adequate mens rea to commit murder or kidnapping. Poor concentration, difficulty thinking in stressful situations, and susceptibility to manipulation all fall into this category.

Only one of the mental deficits— Erickson's low awareness of surroundings—could potentially be relevant in determining intent to commit murder or kidnapping, but it is not relevant here. Dr. Watson observed that Erickson "has impairments . . . in . . . track[ing] ongoing events" and that he "is quite unobservant of his visual environment." Tr. of Pretrial Conf. (Morning Session) [ECF 708] at 65:24–66:3; Exs. to Gov't's Mot. in Lim. [ECF 625] Ex. 3 at 25. Yet such computational deficits do not go so far as to indicate that Erickson would have difficulty understanding the grim torture-killing that he had allegedly witnessed and participated in—one that lasted for hours and involved many discrete events. And while Erickson may not have been fully aware of the circumstances surrounding Huggins's kidnapping, his low attention

to his surroundings would not prevent him from understanding that Huggins—who was bound, strapped to a chair, beaten, and stabbed to death—was being held against his will. *See* 18 U.S.C. § 1201(a)(1) (elements of kidnapping); *see also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 n.3 (1994) ("Criminal intent serves to separate those who understand the wrongful nature of their act from those who do not, but does not require knowledge of the precise consequences that may flow from that act once aware that the act is wrongful.").

At bottom, Erickson had the capacity to the intent to murder and kidnap Huggins. Because none of the offered evidence could plausibly negate that fact, it would not have been helpful to a jury in evaluating Erickson's intent. Thus, I find the evidence excludable under Rule 401.

### B. Rule 403

Even if the diminished capacity testimony had some relevance, its probative value would nevertheless be substantially outweighed by its potential to mislead the jury under Fed. R. Evid. 403. Neuroscience is complicated. It is an ever-evolving field, rife with impenetrable jargon and intricate diagrams. As such, researchers have found that those untrained in neuroscience have difficulty parsing psychiatric evidence. Teneille Brown & Emily Murphy, *Through a Scanner Darkly: Functional Neuroimaging as Evidence of a Criminal Defendant's Past Mental States*, 62 Stan. L. Rev. 1119, 1200–02 (2009). Brain scans in particular have "unique persuasive power, causing viewers to overlook serious logical errors and, therefore, to make improper inferences." *Id.* at 1202.

More troubling than the potential for psychiatric evidence to be misunderstood is its potential to be misused. Jurors, unaware of the convoluted history behind diminished capacity defense, could unintentionally use the offered evidence for impermissible means. For example, a

juror who finds the offered evidence credible may wrongfully conclude that it creates a

reasonable doubt as to Erickson's ability to form intent in any circumstance. In so doing, the

juror resurrects the old insanity defense that IDRA abolished. *Cameron*, 907 F.2d at 1061–62. Or

a juror could find that Erickson acted merely out of impulsivity rather than intentionally—

another line of thinking that IDRA rejected. *Id.* at 1061; *Pohlot*, 827 F.2d at 906.

Such logical traps are particularly tempting in this case because the proper use of the

diminished capacity evidence offered is so limited and of so little relevance. In attempting to

assign significance to the dense expert testimony they heard, jurors could stretch the offered

testimony far beyond the mens rea negation purpose for which it could be used. Along similar

lines, jurors could give the testimony extra weight to compensate for the limited scope of its

admissibility. Accordingly, I find the potential for misuse here is substantial and a limiting

instruction could not sufficiently mitigate such potential.

In some cases, psychiatric evidence may be relevant enough to not be substantially

outweighed by its propensity to mislead. But that is surely not the case here, where the relevance

of the offered evidence is minimal at best and the mens rea for the charged crimes is simple.

Thus, I find that even if Erickson's offered diminished capacity evidence was admissible under

Fed. R. Evid. 401, it would nevertheless be inadmissible under Fed. R. Evid. 403.

## CONCLUSION

For the reasons explained above, I GRANT the government's Motion in Limine to
Exclude Defendant Erickson's Mental Health Experts [ECF 619].


IT IS SO ORDERED.

DATED this ___7th___ day of January, 2022.

                                        MICHAEL W. MOSMAN
                                        United States District Judge